RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 12a0400p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

BROTHERHOOD OF LOCOMOTIVE ENGINEERS
AND TRAINMEN,
            *Petitioner-Appellant*,

    *v.*

UNITED TRANSPORTATION UNION,
            *Defendant-Appellee*,

NORFOLK SOUTHERN RAILWAY COMPANY,
            *Respondent-Appellee*.

No. 11-4177

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:10-cv-1532—Christopher A. Boyko, District Judge.

Decided and Filed: December 5, 2012

Before: GUY, DAUGHTREY, and STRANCH, Circuit Judges.

—————————

## COUNSEL

**ON BRIEF:** Michael S. Wolly, ZWERDLING, PAUL, KAHN & WOLLY, P.C.,
Washington, D.C., for Appellant. Clinton J. Miller III, Erika A. Diehl, UNITED
TRANSPORTATION UNION, North Olmsted, Ohio, John B. Lewis, Jeffrey R. Vlasek,
BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellees.

—————————

## OPINION

—————————

JANE B. STRANCH, Circuit Judge. This appeal concerns a three-cornered
dispute between two unions—the Brotherhood of Locomotive Engineers and Trainmen
(BLET) and the United Transportation Union (UTU)—and an employer—the Norfolk
Southern Railway Company (Norfolk)—that bargains with both of them. UTU filed a
grievance on behalf of two of its members at Norfolk who alleged that they lost their

1

seniority upon promotion from trainmen to engineers.  The trouble was that BLET's collective bargaining agreement (CBA), which they came under upon becoming engineers, assigned seniority based on date of promotion to engineer rather than date of hire as trainman.  An arbitration board heard the grievance and decided in the employees' favor.  BLET sought to vacate the arbitration award but was thwarted when the district court granted summary judgment in favor of UTU and Norfolk.  BLET now appeals.  Because the arbitration board acted within its authority, we **AFFIRM**.

## I.  OVERVIEW

### A.  Factual background

Understanding this dispute requires a brief foray into the arcane world of railroad craft work.  Norfolk's "operating" employees, those who run the trains, are generally divided into train service workers and engine service workers.  Engineers are engine service workers responsible for operating the locomotives.  By contrast, train service workers perform switching and other groundwork, such as separating cars and setting hand brakes; their ranks include conductors and trainmen.  BLET is the authorized representative under the Railway Labor Act (RLA) for Norfolk's locomotive engineers, while UTU represents the company's conductors and trainmen.  Despite this craft-based division of representation, an operating employee may pay dues to UTU or BLET and have either union handle his grievances.  *See* 45 U.S.C. § 152, Eleventh (c).

Norfolk requires all train service employees to advance to an engine service position based on the company's needs through its Locomotive Engineer Training program (the Training program).  UTU's CBA governs the terms and conditions of a train service employee's work until he completes the Training program.  After that point, an employee is covered by BLET's CBA when performing engine service work.

The underlying dispute here stems from a grievance UTU filed on behalf of two of its members, H.N Stokes and E.E. Hall, who worked in Norfolk's Virginia Division.[1]

---

[1]The claim of a third employee was dismissed due to that employee's resignation.

After completing the Training program, the men challenged their placement on an engineer seniority roster, arguing they should be ranked in the order they became trainmen, not in the order they ultimately became engineers.

Three sets of agreements—all of which were presented to the arbitration board to resolve this matter—are relevant to this appeal: the national agreement between BLET and Norfolk; the national agreements entered into by UTU and Norfolk; and the regional arrangements to which BLET, UTU, and Norfolk agreed. With respect to the first set, BLET and Norfolk entered into an agreement in 1980 addressing seniority rights of those who completed the Training program (the 1980 BLET Agreement). Article 21(1)(g) of that agreement establishes that the seniority of such employees as engineers "shall date from day of promotion." Article 21(1)(c), however, deviates from this order. Addressing the relative seniority rights of those promoted to engineer "out of turn," it permits a senior trainman to displace a junior trainman promoted to be an engineer once that senior trainman is available and other conditions are met.

Norfolk also has several national contracts with UTU that contain provisions relevant to this dispute. The 1985 UTU National Agreement (the 1985 UTU Agreement) requires the selection process for engine service to be based on "relative seniority standing." On March 7, 1988, UTU and Norfolk signed a Memorandum Agreement (the 1988 UTU Memo Agreement) that established selection and application guidelines for employees entering the Training program. Eight years later, on January 26, 1996, UTU and Norfolk changed the selection process in a new Memorandum Agreement (the 1996 UTU Memo Agreement), which required employees with train service seniority after November 1, 1985 to attend the Training program "in order of their trainmen's seniority." The 1996 Memo Agreement also defined geographic zones from which employees in Norfolk's Virginia Division would be sent to the Training program.[2]

---

[2]The relevant portion of this agreement provided as follows:

For the purpose of determining the proper order for sending employees to [the Training program] the following zones will be in effect on the Virginia Division.

    a. Shenandoah – Hagerstown District and Shenandoah Yard.
    b. Roanoke – Roanoke Terminal, Radford District, Roanoke District,

Finally, the third set of agreements relevant here are regional arrangements into which BLET, UTU, and Norfolk entered. On February 11, 2002, UTU and Norfolk entered into one such agreement governing the selection of trainmen for the Training program in the zones of the Central Region Hub Network (the 2002 UTU Central Region Agreement), which covers an area separate from the Virginia Division. It provided that, "Employees with trainmen seniority after October 31, 1985 will be sent to [the Training program] in seniority order from [the Training program] promotion zone where the Carrier determines the engineer need exists." Seniority order would be determined on an "order of selection list . . . using [each Central Region Hub Network employee's] earliest trainm[a]n seniority date." Two days later, on February 13, 2002, Norfolk and BLET entered into a side letter agreement (the 2002 BLET Central Region Side Letter) giving an employee in this area who was promoted to engineer a seniority rank based on the date of his earliest trainman seniority date, *not* the date of his promotion to engineer. Referring directly to the 2002 UTU Central Region Agreement, the 2002 BLET Central Region Side Letter stated:

> This refers to our discussion in conference regarding the proper application of Article 21(1)(c) and (g) of the Engineers['] Schedule Agreement. During conference, it was agreed that subsequent to the date of this understanding the proper application of this provision is that employees on the Central Region Hub Network upon successful completion of the Locomotive Engineer Training Program will remain in the same relative order on the engineer's seniority roster as they appear on the order of selection list, outlined in paragraph 4(a) of the Memorandum Agreement dated February 11, 2002.

Then, on August 16, 2006, UTU and Norfolk entered into a similar regional agreement governing the selection of trainmen for the Training program in the zones of the Pocahontas District (the 2006 UTU Pocahontas Agreement), which also covers an area separate from the Virginia Division. This agreement was akin to the 2002 UTU Central Region Agreement in all of its particulars. The same day, BLET and Norfolk

---

Winston-Salem District, Norfolk/West, Radford Yard, Bristol Yard.
c. Crewe – Norfolk/East, Crewe/Petersburg Yard, Suffolk Yard, NF&D District.
d. Norfolk – Norfolk Terminal.

entered into a side letter agreement (the 2006 BLET Pocahontas Side Letter) whose language was nearly identical to the 2002 BLET Central Region Side Letter and similarly referred to the UTU's corresponding regional agreement. Thus, both side letters granted engineer seniority based on the date of an employee's earliest trainman seniority.

On or about March 4, 2008, Norfolk proposed that the same arrangement apply to the establishment of engineer seniority for the Virginia Division. BLET, however, did not agree to this.

Stokes and Hall, the grievants in this case, started working for Norfolk in train service jobs in the Virginia Division's Crewe zone in July 1997. In January 2005, they were required to attend the Training program that would supply engineers for that zone. After they completed the program, they were placed on a Virginia Division engineer seniority roster according to the date they began the Training program. This placed them behind two co-workers from the Roanoke zone, another part of the Virginia Division, each of whom began working as a trainman at or after the time Stokes and Hall started in that position. One of those co-workers started as a trainman in March 1997 and established engineer seniority in July 1998, when he was selected for the Training program due to Norfolk's need for engineers in the Roanoke zone. The second co-worker became a trainman in August 1997 and established engineer seniority in August 1998. Stokes and Hall, in short, had six fewer years of engineer seniority than these two individuals, despite the fact that all four men began working as trainmen at roughly the same time.

## B. Procedural history

UTU took exception to the seniority assigned to Stokes and Hall and filed a grievance on their behalf asserting that each should be ranked in the same relative order as his train service seniority. The claim was progressed and eventually referred to Public Law Board No. 7310 (the Board), an arbitration panel created to resolve the dispute pursuant to an agreement UTU and Norfolk entered into on April 6, 2009 (the Arbitration Agreement). The Arbitration Agreement limited the jurisdiction of the

Board to those grievances Stokes and Hall "submitted to [the Board] under this agreement, arising out of the interpretation or application of applicable agreements between [Norfolk] and the employees of [Norfolk] represented by [UTU] governing rates of pay, rules or working conditions." It further stated the Board would not have "jurisdiction of disputes growing out of requests for changes in rates of pay, rules or working conditions nor have authority to change existing agreements or establish new rules."

Although the dispute was technically between UTU and Norfolk, BLET was invited to participate in the Board proceedings as a third party since the Board would have to determine the interplay of the seniority provisions in BLET's CBA with those in UTU's. Anticipating this, Paragraph 8 of the Arbitration Agreement detailed how the Board would deal with non-UTU CBAs involved in the grievance. In pertinent part, it stated:

> If any claim or grievance involves an employee or work subject to any rule contained in an agreement other than that under the administrative jurisdiction of the General Committee of Adjustment progressing the dispute hereunder, such claim or grievance will be disposed of under the recognized interpretation placed upon the schedule rule involved by the Carrier and the General Committee of the Organization signature [sic] to that agreement; and the Board shall forthwith make written request for the delivery to it of such interpretation within 30 days. In the absence of such established interpretation placed upon the schedule rule involved, the award issued in resolving the claim or grievance shall not constitute a precedent as to the interpretation or application of such schedule rule.

For its part, BLET presented a third party submission to the Board and participated in oral argument during the hearing. BLET also agreed to allow UTU to take the claims to arbitration and acceded to the selection of the neutral member of the Board. All of the UTU and BLET agreements described above were submitted to the Board.

The Board sustained the claims of Stokes and Hall and ordered that they be ranked on the seniority roster "according to their train service seniority," without regard to the dates on which they had actually been promoted to locomotive engineer. Relying

on Article 21 in the 1980 BLET Agreement, as well as the regional agreements entered into by Norfolk, UTU, and BLET, the Board reasoned:

> To this Board the language utilized in the February 13, 2002 Side Letter Agreement [between BLET and Norfolk respecting the Central Region], which accompanied the February 11, 2002 establishment of an order of selection list for the Central Hub Region Network [between UTU and Norfolk], is critical. It specifically described the "proper application of Article 21" with respect to employee ranking on the engineers seniority roster. Identical language was utilized in a BLET Side Letter to the 2006 Pocahontas Division Order of Selection Agreement. Both of these Agreements were amendments to the January 26, 1996 Letter of Understanding [between UTU and Norfolk], which established the order of selection list for the Virginia Division, [and] were not stand alone agreements. Therefore, the Board finds that they merit consideration with respect to the instant dispute. After examining the contract language and the language contained in the amendments to this agreement, the Board finds that effective February 13, 2002 [the date the first BLET-Norfolk side letter was signed], the ranking of employees selected for [the Training program] in accordance with an order of selection list permitted under the provisions of the 1996 Letter of Understanding [between UTU and Norfolk], or any modifications thereto, should have been accomplished according to their relative train-service seniority ranking.

On July 9, 2010, BLET filed a Complaint and Petition for Review against Norfolk and UTU seeking to vacate the Board's award pursuant to Section 3 First (q) of the RLA, 45 U.S.C. § 153 First(q). The parties moved for summary judgment. The magistrate judge filed a Report and Recommendation vacating the Board's award on July 14, 2011. After objections to the magistrate's Report and Recommendation were filed, the district court overruled the magistrate's decision and reinstated the Board's award, denied BLET's motion for summary judgment, and granted Norfolk's and UTU's motions for summary judgment. BLET timely appealed. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 because the district court's order is an appealable final decision.

## II.  ANALYSIS

### A.  Standard of review

"This Court reviews a district court's grant of summary judgment in a labor arbitration dispute *de novo*."  *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Local 664C*, 532 F.3d 405, 410 (6th Cir. 2008) (citation omitted). Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Where the court reviews de novo the district court's decision to enforce or vacate an arbitrator's award, "the focus is on the arbitrator's analysis, not that of the district court." *Truck Drivers Local No. 164 v. Allied Waste Sys., Inc.*, 512 F.3d 211, 216 (6th Cir. 2008).

### B.  Legal framework

#### 1.  Review of arbitration decisions under the RLA

The RLA governs disputes between management and labor in the railroad industry.  *See* 45 U.S.C. §§ 151, 153.  Congress included a mandatory arbitral mechanism in the statute to efficiently resolve labor disputes, promote stability in the relationship between rail companies and their employees, and keep such disputes out of the courts.  *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978).  The mandatory arbitration scheme Congress established is unique to the RLA and is not found in the other major federal labor relations statute that covers private sector employees.  *See* National Labor Relations Act, 29 U.S.C. § 151 et seq.

The RLA procedure provides for settlement of so-called minor disputes through contractual grievance procedures.[3]  *See* 45 U.S.C. § 152 First, Second.  Failure to resolve a minor dispute through such procedures triggers compulsory and binding arbitration by

---

[3]Minor disputes concern the interpretation of existing CBAs.  They are distinct from major disputes, which pertain to CBA formation.  *See Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 302–03 (1989).

the National Railroad Adjustment Board (NRAB) or a privately established "special adjustment board," such as the Public Law Board in this case. *See* 45 U.S.C. § 153 First (i); 45 U.S.C. § 153 Second. NRAB awards are "final and binding" on all parties. 45 U.S.C. § 153 First (m).

A party may appeal an arbitration decision, 45 U.S.C. § 153 First (q), but the court's review is "among the narrowest known to the law," *Airline Prof'ls Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. ABX Air, Inc.*, 274 F.3d 1023, 1030 (6th Cir. 2001) (citation omitted). Court review of NRAB awards is limited to three specific grounds: "(1) failure of the Adjustment Board to comply with the requirements of the Railway Labor Act; (2) failure of the Adjustment Board to conform, or confine, itself to matters within the scope of its jurisdiction; and (3) fraud or corruption." *Sheehan*, 439 U.S. at 93 (citing 45 U.S.C. § 153 First (q)). The same standards that govern review of an NRAB award apply when a court reviews an award issued by a "special adjustment board." *Cole v. Erie Lackawanna Ry. Co.*, 541 F.2d 528, 531–32 (6th Cir. 1976). Finally, in reviewing the decisions of RLA-created arbitration boards, the Sixth Circuit has instructed courts to "bear in mind the very narrow standard of review that federal courts are to employ when reviewing [labor] arbitration awards." *ABX Air, Inc.*, 274 F.3d at 1030 (applying the standard for federal court review of labor arbitration awards to a dispute under the RLA to determine whether the arbitrator's award "fails to draw its essence from the terms of the collective bargaining agreement").

### 2. Limited review of labor arbitration decisions

More than a half century ago, the Supreme Court observed that a determination of the "proper approach" for courts to review labor arbitration awards requires a sensitivity to what makes CBAs fundamentally different from contracts between private parties. While a CBA "states the rights and duties of the parties" like any other contract, "[i]t is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578 (1960) (citation omitted). A CBA's objective is "to erect a system of industrial self-government" that permits the relationship between the parties

to be "governed by an agreed-upon rule of law." *Id*. at 580. Unlike a regular contract, a CBA "covers the whole employment relationship," *id.* at 579, where "'[t]here are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties,'" *id*. (quoting Archibald Cox, *Reflections Upon Labor Arbitration*, 72 Harv. L. Rev. 1482, 1498–99 (1959)). As a result, its effectuation demands the development of "'a common law of the shop which implements and furnishes the context of the agreement.'" *Id*. at 580 (quoting Cox, 72 Harv. L. Rev. at 1499).

"Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise . . . . The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the [CBA]." *Id*. at 581. Rather than signaling the "breakdown in the working relationship of the parties," as it does in a commercial setting, labor arbitration "is at the very heart of the system of industrial self-government." *Id*.

The Supreme Court recognized that the federal policy "to promote industrial stabilization through the [CBA]," *id*. at 578, "would be undermined if courts had the final say on the merits of [arbitration] awards," *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960). The "proper approach," therefore, is for courts to refuse to review the merits of an arbitration award. *Id*. "The courts . . . have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960) (footnote omitted). Their role is only "to ascertain[] whether the party seeking arbitration is making a claim which on its face is governed by the contract." *Id*.

As a practical matter, such limited review respects the intent of the parties who specifically bargained for "[the arbitrator's] judgment and all that it connotes." *Id*. Still, an arbitrator's authority has limits. He is "confined to interpretation and application of the [CBA]," and he exceeds the scope of his authority when he "dispense[s] his own

brand of industrial justice." *Enterprise Wheel*, 363 U.S. at 597.  In the final analysis, his judgment must not be disturbed "so long as it draws its essence from the [CBA]."  *Id.*

In the years since the Supreme Court decided these cases—collectively known as  the *Steelworkers Trilogy*—the Court revisited the standard of review of arbitration awards in two decisions, *United Paperworkers International Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29 (1987), and *Major League Baseball Players Association v. Garvey*, 532 U.S. 504 (2001).  In *Michigan Family Resources, Inc. v. Service Employees International Union Local 517M*, we explained that *Misco* and *Garvey* "refine the *Steelworkers Trilogy* in two ways."  475 F.3d 746, 752 (6th Cir. 2007) (en banc).  First, they make clear that the standard between permissible and impermissible arbitration awards is based on "whether 'the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority.'"  *Id*. at 752–53 (quoting *Misco*, 484 U.S. at 38, and citing *Garvey*, 532 U.S. at 509).  Second, the decisions confirm that an arbitrator's errors in resolving the merits of the dispute—be they "'serious,' 'improvident' or even 'silly'"—are of no moment "once it [is] established that the arbitrator was construing or applying the contract."  *Id*. at 753 (quoting *Misco*, 484 U.S. at 38–39, and citing *Garvey*, 532 U.S. at 509–10).

*Michigan Family* brought the Sixth Circuit into line with Supreme Court precedent by expressly overruling the four-part test governing review of arbitration agreements that we articulated in *Cement Divisions, National Gypsum Co. (Huron) v. United Steelworkers of America, AFL-CIO-CLC, Local 135*, 793 F.2d 759, 766 (6th Cir. 1986).  *Id*.  For purposes of this appeal, it is important to review why the *Cement Divisions* inquiry is no longer good law.  *Cement Divisions* held that an award "fails to derive its essence from the agreement" when it (1) conflicts with the CBA's express terms; (2) imposes requirements not expressly provided for in the agreement; (3) lacks rational support or is not rationally derived from the CBA's terms; and (4) is based on considerations of fairness and equity rather than the agreement's precise terms. 793 F.2d at 766.  *Cement Divisions*'s refusal to  recognize that the words of a CBA are not the exclusive source of rights and duties under it, *contra Warrior & Gulf*, 363 U.S. at 579,

as well as its insistence that a court could vacate an arbitrator's award based solely on its disagreement with his reading of a contract, made it incompatible with Supreme Court authority.

*Michigan Family* harmonized our review of arbitral decisions in the labor context with *Garvey* and *Misco*. In *Michigan Family*, we held that judicial review is confined to deciding whether a "procedural aberration" was present in the arbitration process, and must not focus on matters of substantive interpretation and the outcome an arbitrator reached. 475 F.3d at 753. *Michigan Family* requires us to defer to the arbitrator's decision unless the arbitrator 1) acted outside his authority by resolving a dispute not committed to arbitration; 2) committed fraud, had a conflict of interest, or otherwise acted dishonestly in issuing the award; or 3) was not even "arguably construing or applying the contract" in resolving legal or factual disputes. *Id*. Perhaps anticipating that clever parties would attempt to recast a disagreement with an arbitrator's decision as a claim that he acted outside of his authority, *Michigan Family* "severely curtailed the 'scope of authority' concept." *Allied Waste Sys.*, 512 F.3d at 217. "An arbitrator does not exceed his authority every time he makes an interpretive error; he exceeds that authority *only* when the [CBA] does not commit the dispute to arbitration." *Mich. Family Res.*, 475 F.3d at 756 (emphasis added).

*Michigan Family* emphasized that "only the most egregious awards [would] be vacated" under the "arguably construing" standard. *Id*. at 753. Properly articulated, the analysis focuses on a single question: did "the arbitrator appear[] to be engaged in" interpreting the agreement or agreements before him? *Id*. If so, the court's inquiry ends. If it is unclear, the court "will presume that the arbitrator was doing just that." *Id*. With the window so narrowed, a court may vacate an award only in the "rare exception" when the arbitrator was "so ignorant of the contract's plain language" that "any contention that the arbitrator was construing the contract" is "implausible." *Id*. (internal quotations, internal citation, and alteration omitted). Put otherwise, if the arbitrator's construction is plausible, it must not be disturbed. Accordingly, the outer limits of the "arguably construing" inquiry are reached only when the arbitrator's decision is "'so untethered

to'" the agreements at issue, *id*. at 752 (quoting *Garvey*, 532 U.S. at 512 (Stevens, J., dissenting)), that he enters "the forbidden world of 'effectively dispensing his own brand of industrial justice,'" *id*. (citation, alteration, and internal quotations omitted).

But what of the deference due to an arbitrator's interpretation of the issues submitted to him?  By what standard are courts to review a party's claim that an arbitrator exceeded his authority because he decided issues the parties did not submit to him, or relied on materials the parties did not present?  Although *Michigan Family* was silent on this matter, our case law is clear that an arbitrator's authority is not strictly confined to the "technical limits of the submission."  *Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 155 F.3d 767, 772 (6th Cir. 1998) (internal quotations and citation omitted).  This court has reasoned:

> Considering the strong presumptions in favor of a party's right to arbitration and the extent of an arbitrator's authority, it would be a strange and grudging interpretation of [the] *Steelworkers Trilogy* to demand that arbitrators stay narrowly within the technical limits of the submission . . . . [T]he presumption of authority that attaches to an arbitrator's award applies with equal force to his decision that his award is within the submission.

*Johnston Boiler Co. v. Local Lodge No. 893, Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO*, 753 F.2d 40, 43 (6th Cir. 1985).

Further, Supreme Court precedent and the realities of the privately negotiated system of workplace law support application of the same standard for several reasons. First, more searching judicial review of arbitration submissions undermines the congressional policy in favor of quick and inexpensive means of settling workplace grievances to "achieve the twin goals of industry stabilization and industrial peace." *Titan Tire Corp. of Bryan v. United Steelworkers of Am.*, *Local 890L*, 656 F.3d 368, 372 (6th Cir. 2011) (citing *Warrior & Gulf*, 363 U.S. at 578–79).  Second, because determining the scope of the submission often requires recourse to the CBA itself, it would be inconsistent to defer to the arbitrator's ultimate determination of the CBA's meaning but not to his determination of the scope of a submission based on the same CBA terms.  Third, a deferential standard protects the judiciary from having to

determine, on a case-by-case basis, the precise scope of a submission in the countless disputes that regularly occur in the course of industrial self-government. Finally, by denying parties a backdoor to seek review of adverse arbitration awards, a deferential standard properly constrains the judiciary's power to interfere in the privately negotiated labor arbitration system.

## C. Application

Of the three statutory bases available under the RLA to challenge the award, BLET alleges only that the award fails to conform or confine itself to matters within the Board's jurisdiction, in violation of 45 U.S.C. § 153 First (q). The union does not press any other grounds under the RLA. Thus, only the first and third parts of the *Michigan Family* analysis guide our resolution of the jurisdictional matter, as BLET has not alleged fraud, dishonesty, or a conflict of interest on the Board's part. Accordingly, we first consider whether the Board acted outside its authority by resolving a dispute not committed to arbitration, and subsequently determine whether it was "arguably construing or applying" the contracts before it.

### 1. The scope of the Board's authority

The Board did not exceed its authority by resolving a dispute not committed to arbitration. No party disputes that UTU and Norfolk properly submitted this seniority dispute to the Board pursuant to the Arbitration Agreement between them. And BLET concedes, as it must, that the CBA committed the seniority dispute to the Board. Instead, BLET makes a two-pronged attack on the Board's view of its own authority as defined by the issues submitted to it. BLET first argues that the Board overstepped its authority by failing to adopt the "recognized interpretation" BLET and Norfolk placed on Article 21, the seniority provision in BLET's CBA, as required by Paragraph 8 of the Arbitration Agreement. The language BLET now dubs the "recognized interpretation" states, in pertinent part: "[Norfolk] has maintained that [Article 21] is the controlling agreement for placing engineers on the [seniority] roster . . . and is therefore the prevailing agreement for establishing Claimant's engine seniority . . . . [BLET] agree[s] with

[Norfolk]." BLET concludes that this "recognized interpretation" confined the Board's interpretive reach and made impermissible any deviation from it.

This argument fails, though, because BLET cannot show the parties so clearly delimited the meaning of Article 21 as to make the Board's interpretation of it unsupportable. First, Norfolk and BLET did not unambiguously fix the meaning of Article 21. Paragraph 8 does not define what a "recognized interpretation" is or indicate where the Board is to find it. Also, neither BLET's nor Norfolk's submissions refer to the "recognized interpretation" of Article 21 or direct the Board to apply one. Second, it is not clear that Paragraph 8's purpose is to impose the "recognized interpretation" of Article 21 on the Board. Paragraph 8, read as a whole, can be understood to describe the circumstances in which an arbitration award "constitute[s] a precedent as to the interpretation or application of [a] schedule rule." When viewed in this light, Paragraph 8 instructs that an award that applies the "recognized interpretation" of a rule has precedential value, but lacks it when the "recognized interpretation" is not used (because, for example, the parties cannot agree to one or simply fail to provide it to the Board).

This is not to say that Paragraph 8 does not have the meaning BLET wishes it to have. But it is to say that Paragraph 8 has more than one plausible meaning. And when confronted with an ambiguous term, it is not beyond the Board's power to determine a meaning that finds support in the language of the agreement. Undoubtedly, parties may "limit the arbitrator's authority by careful drafting of the submission." *Johnston Boiler Co.*, 753 F.2d at 43 (citation omitted). Here, though, they did not. Having submitted to the Board a seniority dispute that required it to interpret several contract provisions, including Article 21, the parties failed to unambiguously limit the Board's power to construe them in service of settling the underlying seniority issue. Because the Board's determination of the issues submitted to it for decision is due the same deference as its award on the merits, and because the Board did not cross any clear line the parties set before it, the Board did not exceed its jurisdiction.

BLET's second argument is that the Board acted outside of its authority because its award invaded BLET's representational province. Specifically, BLET contends that the Board was not permitted to alter BLET's agreement by allowing the provisions of UTU's agreement to control the seniority of BLET members. We disagree. BLET takes too cramped a view of the Board's job in this case. The Arbitration Agreement required the Board to interpret the "applicable agreements" between Norfolk and the employees represented by UTU. Due to the unique structure of representation in the railroad industry, which permits a trainman or engineer to join either UTU or BLET, *see* 45 U.S.C. § 152 Eleventh (c), UTU represented the grievants but BLET's contract governed their terms and conditions of work when they were promoted. As a consequence, the Board could not resolve the dispute in a vacuum.

Norfolk's duties to the grievants under the BLET contract depend on how its seniority terms mesh with those in UTU's agreement. The Board perceived a conflict between UTU's agreement, which protected an employee from losing seniority if he was not selected for the Training program through no fault of his own, and the application of BLET's agreement, which led to that precise result here. It also took into account the provision in UTU's contract that precluded Norfolk from assigning the grievants seniority dates behind those with less train service seniority.

At bottom, the Board reconciled competing contract terms and the parties' practices to determine the "common law of the shop." The Board understood that both contracts govern Norfolk's relationship with its trainmen who later are required to be trained as engineers. And it concluded that Norfolk's agreements with UTU and BLET needed to be construed where the two contracts failed to provide the grievants a seamless transition from the terms that governed them as trainmen to the provisions that ruled them as engineers. In deciding that one contract was modified by another, and by the parties' actions, the Board engaged in ordinary CBA construction. The Board's interpretation of the two unions' contracts did not exceed its jurisdiction.

Finally, we decline to decide whether BLET waived its claims when it failed to challenge the jurisdiction of the Board before it filed this action in federal court. We

observe, though, that BLET's extensive participation before and during the hearing—agreeing to allow UTU to take the claims to arbitration, consenting to the selection of the neutral Board member, filing a formal submission, and presenting oral argument—suggests that BLET submitted to the Board's authority to interpret the agreements before it, which included BLET's Article 21. Be that as it may, we do not decide whether BLET waived its rights in this circumstance.

In sum, under the facts of this case, we conclude that the Board did not exceed its jurisdiction. Because the Board's view of the issues it must decide is due the same deference as its award on the merits, and because it did not cross any clear line the parties set before it, the Board did not exceed its authority when it interpreted the seniority provision in BLET's CBA. Moreover, the Board's award did not encroach upon BLET's representational province because its interpretation of the grievants' rights under the UTU agreement required consideration of the BLET agreement, and vice versa.

### 2. The Board's application of the contract provisions

We next consider whether the Board was "arguably construing or applying" the contract in resolving the dispute, and conclude that the Board's award was not so ignorant of or so untethered from the engineer seniority rule at issue "as to make implausible any contention that the arbitrator was construing the contract." *Mich. Family Res.*, 475 F.3d at 753.

*Michigan Family* instructs us to analyze both the form and substance of the Board's actions to determine if it was "arguably construing" the materials before it. Matters of form focus on whether the arbitrator was engaged in the act of interpretation. In *Michigan Family*, we observed: the "arbitrator's ten-page opinion has all the hallmarks of interpretation. He refers to, quotes from and analyzes the pertinent provisions of the agreement, and at no point does he say anything indicating that he was doing anything other than trying to reach a good-faith interpretation of the contract." *Id.* at 754.

Here, too, the Board's four-page opinion refers to and analyzes provisions from multiple agreements.  It acknowledges the geographic limitations of the side letters and recognizes that a similar side letter was never executed in connection with the area where the grievants worked.  The Board also discusses whether the BLET-Norfolk side letters' allowance for "date of hire" engineer seniority in two geographic areas supports UTU's claim for the same rule in a third.  After considering the meaning and interplay of these CBA provisions, the Board announced its decision.  Whether its decision is right or not, the Board was clearly engaged in interpretation.

BLET does not seriously dispute that the Board actually interpreted the agreements placed before it.  Instead, BLET attacks the merits of the award, insisting that no arguable construction of its agreements with Norfolk supports the Board's decision.  BLET's arguments have some appeal, as the side letters by their terms appear to be limited to certain geographic areas.  However, while BLET offers one possible reading—perhaps even a better reading than the Board rendered—it is not the only possible reading.  The side letters do not unambiguously state that the "date of hire" seniority rule does not apply to other geographic areas.  For example, the reference in the first sentence to "the proper application of Article 21(1)(c) and (g)" may refer to an updated meaning of Article 21(1) that applies to all BLET-represented employees. Under this view, which appears to be how the Board interpreted the phrase, the 2002 BLET Central Region Side Letter revised the meaning of seniority order terms in the 1980 BLET Agreement to reflect subsequent practices.  This newer meaning, applicable to all employees under BLET's agreement, was initially implemented by the 2002 BLET Central Region Side Letter only with respect to the employees in the named area, and subsequently administered in another region in 2006.

Moreover, the fact that BLET refused to accede to a similar side letter for the area where the two grievants work does not do the work BLET hopes.  Failure to enter into a third side letter does not change the operative language of the first two, which the Board interpreted to permit "date of hire" seniority for the grievants.  While BLET's

refusal may be further evidence supporting its position, the Board's award makes clear that it considered—and rejected—the significance BLET attached to it.

In sum, the Board offered an interpretation that construed an ambiguity it perceived in BLET's contractual provisions in light of the parties' practices and language in both unions' agreements. It is not our job to determine whether the Board's reading is the best reading. And we need not resolve whether we would offer the same interpretation if we were to decide the dispute in the first instance. Our task is limited to asking whether the Board's interpretation was so ignorant of or untethered from the agreements "as to make implausible any contention that the arbitrator was construing the contract." *Id*. at 753. Here, we are confident that the Board's interpretation was built of the raw materials it considered.

Finally, we allow the Board's award to stand to give effect to the Congressional policy of respecting arbitration of collective bargaining disputes, both generally and as specifically articulated in the RLA. The parties here bargained for "the 'arbitrator's construction,' not three layers of federal judicial review." *Id*. at 756. We must defer to "that delegation of decision-making authority." *Id.*

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court.