NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0611n.06

No. 18-3323

**FILED**
Dec 05, 2018
DEBORAH S. HUNT, Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS - TRANSPORTATION DIVISION, "SMART-TD"; AMAZIAH P. BARNETTE; BRACKEN R. BURD; JUSTIN M. DEAN; MICHAEL T. FOSTER; BRIAN G. GRONAU; JEFFERY A. HABEL; NICHOLAS L. INGRODI; SHAWN P. KONNERTH; DAVID D. LYON; BRANT L. WALKER, | ) ) ) ) ) ) ) ) ) ) ) | |
| Petitioners-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | OPINION |
| CSX TRANSPORTATION, INC., | ) ) | |
| Respondent-Appellee. | ) ) | |

**BEFORE:** SUHRHEINRICH, MOORE, and BUSH, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** Appellants International Association of Sheet Metal, Air, Rail and Transportation Workers - Transportation Division and several of its members (collectively, "SMART-TD") appeal the district court's grant of summary judgment to appellee CSX Transportation, Inc. ("CSXT"), upholding an arbitration award in CSXT's favor. For the reasons that follow, we **AFFIRM**.

## I. FACTS

Appellee CSXT is a railway carrier that employs the individually-named appellants. These individuals are members of the International Association of Sheet Metal, Air, Rail and Transportation Workers - Transportation Division union.

This case concerns the exercise of "displacement rights" by SMART-TD members. Displacement rights, or "seniority rights," allow employees to displace more junior employees from certain job assignments. The displaced employees then have a set amount of time in which to displace employees junior to them from *their* assignments.

In 1994, CSXT's predecessor in interest executed a collective bargaining agreement ("CBA") with SMART-TD's predecessor that, in the CBA's Rule 8(d)(2), established the following time period for the exercise of displacement rights: "Road or yard men who have displacement rights and can hold a turn at the terminal where displacement occurred must either exercise their displacement rights or obtain a leave of absence within thirty (30) days or their service record will be marked VUA (Voluntary Unexplained Absence.)." (R. 13-4, Page ID# 405.) As a result of a VUA, an employee's name could be removed from the seniority roster after appropriate steps were taken by the employer.

In 1996, the union and carrier renegotiated the CBA, including its terms on displacement rights. Article XII of the new agreement, the "UTU National Agreement," reduced the time in which an employee must exercise displacement rights from thirty days to forty-eight hours:

Section 1

(a) Where agreements that provide for the exercise of displacement rights within a shorter time period are not in effect, existing rules, excluding crew consist agreements, are amended to provide that an employee who has a displacement right on any position (including extra boards)[1] within a terminal or within 30 miles of such employee's current reporting point, whichever is greater, must, from the time of proper notification under the applicable agreement or practice, exercise that displacement right within forty-eight (48) hours.

(b) Failure of an employee to exercise displacement rights, as provided in (a) above, will result in said employee being assigned to the applicable extra board, seniority permitting. (The applicable extra board is the extra board protecting the assignment from which displaced.)

. . .

Section 2

This Article shall become effective June l, 1996 and is not intended to restrict any of the existing rights of a carrier.

(R. 13-2, Page ID## 275–76.)

The agreement also contained negotiated "Q&As" intended to "inform the application of

Article XII . . . ." (R. 17, Page ID# 662.) The relevant Q&As are numbers 3 and 7:

Q-3: How is an employee covered by this Article handled who fails to exercise seniority placement within 48 hours?

A-3: Such employee is assigned to the applicable extra board, seniority permitting, pursuant to Section 1(b) and subsequently governed by existing rules and/or practices.

. . .

Q-7: Is it the intent of Article XII to impose discipline on employees who fail to exercise seniority within 48 hours?

A-7: No, Section 1(b) provides that in these circumstances the employee will be assigned to the applicable extra board, seniority permitting. The employee

---

[1] According to CSXT, "[a]n 'extra board' is a list of on-call employees used to fill vacancies in regular schedules, such as when a regularly assigned employee takes vacation." Appellee Br. at 4 n.1.

> will then be subject to existing rules and practices governing service on such extra board.

(R. 13-2, Page ID## 277–78.)

CSXT has also unilaterally imposed a "minimum availability" attendance policy, which it amended in 2010. This policy provides that any employee who is "unavailable for any non-compensated reason (other than rest days and time off mandated by the Hours of Service Act . . .) on 2 or more days in a rolling 4-week period will be subject to review." (R. 13-4, Page ID# 423.) Under the policy, an employee is "unavailable" if he is "off" work for a non-compensated reason for more than twelve hours. (*Id.* at Page ID## 430–31.)

CSXT issued Q&As to accompany the 2010 attendance policy. Relevant to this appeal, Q&A 3 reads, "Will the revised standards violate schedule agreement displacement rules? . . . . No. Contractual displacement rules will be respected." (*Id.* at Page ID# 430.)

This dispute arose when each of the individual appellants was displaced at least once within a four-week period. All but three of them exercised their seniority rights near the end of the forty-eight-hour window set by the CBA. Thus, they were each unavailable for two days under CSXT's attendance policy.

CSXT disciplined the individual appellants for their unavailability. SMART-TD objected, arguing that the CBA protected employees from discipline so long as they exercised their displacement rights within forty-eight hours. Unable to resolve the disagreement, the parties submitted the matter to arbitration before the National Railroad Adjustment Board, as required under 45 U.S.C. § 153.

The arbitrator found in favor of CSXT on all claims. She determined that the CBA and CSXT's availability policies were not in conflict because the CBA did not give employees a right

to be free from discipline for unavailability. Furthermore, the arbitrator considered previous arbitration awards interpreting the same or similar CBA provisions; several of the previous awards had found that the displacement policies did not affect CSXT's rights to set and enforce disciplinary policies. The arbitrator also considered the 1996 Q&As and found that they did not speak to CSXT's disciplinary powers either. In light of all of this evidence, the arbitrator ruled that CSXT had not violated the CBA by imposing discipline on the SMART-TD members.

## II. PROCEDURAL BACKGROUND

SMART-TD sued CSXT in federal district court, arguing that the arbitrator had "ignored the plain and unambiguous . . . language of . . . Article XII (Displacement) of the 1996 UTU National Agreement, including Q&A 7" in denying the individual appellants' claims for relief. (R. 1, Page ID# 6.) CSXT moved for summary judgment, and the district court granted the motion.

SMART-TD appealed.

## III. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 700 F.3d 891, 898 (6th Cir. 2012). "Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted). "Where the court reviews de novo the district court's decision to enforce or vacate an arbitrator's award, 'the focus is on the arbitrator's analysis, not that of the district court.'" *Id.* (quoting *Truck Drivers Local No. 164 v. Allied Waste Sys., Inc.*, 512 F.3d 211, 216 (6th Cir. 2008)).

## IV. DISCUSSION

To state the standard for review of a labor arbitrator's decision is to resolve this case. We established the standard in *Michigan Family Resources, Inc. v. Service Employees International Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007) (en banc):

> Did the arbitrator act outside his authority by resolving a dispute not committed to arbitration? Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator arguably construing or applying the contract? So long as the arbitrator does not offend any of these requirements, the request for judicial intervention should be resisted even though the arbitrator made serious, improvident or silly errors in resolving the merits of the dispute.

(citations and internal quotation marks omitted). We continued:

> [W]e cannot ignore the specter that an arbitration decision could be so "ignor[ant]" of the contract's "plain language" . . . as to make implausible any contention that the arbitrator was construing the contract . . . . Such an exception . . . is reserved for the rare case. For in most cases, it will suffice to enforce the award that the arbitrator appeared to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that.

*Id.* (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco*, 484 U.S. 29, 38 (1987)).

As *Michigan Family* makes clear, our review of a labor arbitrator's decision is extraordinarily deferential: indeed, it is "among the narrowest known to the law." *Bhd. of Locomotive Eng'rs & Trainmen*, 700 F.3d at 899 (citation and internal quotation marks omitted). We do not review the arbitrator's interpretation of the CBA de novo. All that we are allowed to do is determine whether the arbitrator in this case "*arguably* constru[ed] or appl[ied] the contract." *Mich. Family*, 475 F.3d at 753 (emphasis added). If the answer is yes, then the district court was correct in upholding the award on summary judgment.

We hold that the arbitration award in this case satisfies the *Michigan Family* standard because the arbitrator chose an interpretation of the CBA that makes clear the arbitrator was

"construing" the parties' agreement. *Id.* It is worth reiterating the relevant language from Article XII: "[A]n employee who has a displacement right on any position (including extra boards) . . . must, from the time of proper notification under the applicable agreement or practice, exercise that displacement right within forty-eight (48) hours." (R. 13-2, Page ID## 275–76.) Read literally, this language dictates a maximum period of time in which employees may exercise their displacement rights; it does not give employees a right to wait a certain amount of time before exercising those rights. The arbitrator adopted this interpretation in her award.

But SMART-TD contends that the arbitrator was not construing the CBA because SMART-TD reads Article XII as mandating that "[e]mployees simply *cannot* be disciplined for failing to exercise seniority within the allotted 48 hours." Appellant Br. at 13. Under that reading, there would be a conflict between the CBA and the availability policies. However, SMART-TD's preferred interpretation does not necessarily follow from Article XII itself or from the Q&As, which SMART-TD cites as supporting its interpretation. In particular, Q&A 7—"Is it the intent of Article XII to impose discipline on employees who fail to exercise seniority within 48 hours? . . . . No"—only clarifies that Article XII itself is not an instrument of discipline and was merely intended to modify the rules governing displacement rights. It says nothing about the interaction of the CBA with CSXT's availability policies.

What is more, it was within the arbitrator's discretion to find that the displacement policies govern the rights of senior employees vis-à-vis more junior employees, whereas CSXT's availability policies govern the rights of employees vis-à-vis their employer. As CSXT argued before the arbitrator, "Nothing in the Agreements creating the 48-hour period for exercising seniority to another assignment also created the right to be unavailable for work during that period." (R. 1-1, Page ID# 13.) The arbitrator acted within her discretion to credit this statement

as true, based on the face of Article XII itself as well as the 1996 Q&As. To be sure, there may be reasonable disagreement as to whether the arbitrator's interpretation of the CBA was correct. But the arbitrator's reasoning does show that she "appeared to be engaged in interpretation," and the outcome she reached was not "ignor[ant]" of the CBA's "plain language." *Mich. Family*, 475 F.3d at 753. This is all that must be established for the arbitrator's award to be upheld.

Nonetheless, SMART-TD also cites Q&As issued in 2010 by CSXT to accompany its amended availability policies.[2] SMART-TD contends that these Q&As "confirmed that [CSXT's existing managerial rights, reserved by Article XII, Section 2] did not include any discipline outside of that negotiated in Section 1(b)." Appellant Br. at 15 n.3. Not only do the 2010 Q&As not say this; in fact, Section 1(b) does not refer to discipline in any way. The most that could be said of the 2010 Q&As is that they suggest both parties understood CSXT's 2010 availability policies not to interfere with the employees' ability to take a full forty-eight hours to displace junior employees. Even so, CSXT expressly noted that "[t]hese questions and answers are not to be construed as a collective bargaining agreement and are subject to unilateral change by the Company." (R. 13-4, Page ID# 430.) Based on this language, the arbitrator could discount SMART-TD's attempt to characterize the 2010 Q&As as binding CSXT to a particular understanding of its availability policies.

And regardless of whatever persuasive quality the 2010 Q&As may have, we must remember that the parties have not handed us a question of interpretation on a de novo platter. Instead, as noted, our standard of review compels us to ask only one question: did the *arbitrator* "appear[] to be engaged in interpretation" when she formulated her award? *Mich. Family*, 475

---

[2] For example, 2010 Q&A 3 reads: "Will the revised standards violate schedule agreement displacement rules? . . . . No. Contractual displacement rules will be respected." (R. 13-4, Page ID# 430.)

F.3d at 753. We are compelled to answer: yes. Although it is arguable that, in light of all the circumstances and the parties' negotiating history, CSXT should not have changed its availability policies to permit disciplinary action against employees within the forty-eight hours, that position is based on only one arguably correct reading of the CBA. The other arguably correct reading is that chosen by the arbitrator.

The dissent suggests that this conclusion depends on our finding in the CBA an "ambigu[ity]" that does not exist. *See* Dissent at 18. That is not so. First, our point is not that the CBA's treatment of unavailable employees is ambiguous; rather, our point is that the CBA simply does not address its interaction with CSXT's availability policies at all. What is more, the dissent would have us not only disagree with the arbitrator on an interpretative matter but also find that that disagreement warrants reversing the district court's decision to uphold the award. To do so would be to overstep our authority under *Michigan Family*, under which we may not reverse a district court's decision to uphold an award unless the award is wholly "ignor[ant]" of the CBA's "plain language." 475 F.3d at 753. Whether we disagree with the arbitrator is not the standard for our review. The standard, to reiterate, is whether the arbitrator adopted an *arguably correct* construction or application of the CBA. *See id.*

The arbitrator's ruling satisfies this requirement. It finds support not only in the text of the specific Article XII section at issue but also in the ample contextual material the arbitrator considered. In reaching her conclusion, the arbitrator considered both the surrounding language in Article XII and previous arbitration decisions interpreting the same CBA. Specifically, the arbitrator noted Section 2's assurance that "[t]his Article . . . is not intended to restrict any of the existing rights of a carrier." (R. 1-1, Page ID# 16.) The arbitrator read this language as preserving all of CSXT's prerogatives with regard to setting its disciplinary policies.

It is true that under the 1994 agreement, Rule 8(d)(2) had not appeared to preserve in CSXT any right to discipline employees who exercised their displacement rights within the period (then, thirty days) allotted for exercising displacement rights. After all, that rule provided that employees "must either exercise their displacement rights or obtain a leave of absence within thirty (30) days or their service record will be marked VUA (Voluntary Unexplained Absence.)." (R. 13-4, Page ID# 405.) This language appears to have made the possibility of being marked unavailable an exclusionary alternative to the possibility of exercising rights within the thirty-day period, rather than a coexisting reality. But the record is not clear on how Rule 8(d)(2) was implemented, including how CSXT enforced its disciplinary policies in light of the rule. Although SMART-TD argued to the arbitrator "that the Carrier [had] lacked the right to discipline for attendance violations under the prior displacement provisions," the arbitrator noted that "no authority ha[d] been cited" in support of that assertion. (R. 1-1, Page ID# 16.) We cannot say that the arbitrator forsook the enterprise of interpretation when she determined that the 1996 CBA did not curtail CSXT's disciplinary rights.[3]

Further supporting our conclusion that the arbitrator "appeared to be engaged in interpretation" when she issued her decision, she considered prior arbitration decisions applying similar agreements. *Mich. Family*, 475 F.3d at 753. In particular, one prior decision considered by the arbitrator had interpreted Article XII not to preclude disciplinary action against employees who exercise their displacement rights within the forty-eight-hour period: "[T]he Agreement . . .

---

[3] Furthermore, even had the arbitrator been wrong in assessing the extent of CSXT's pre-1996 disciplinary rights, it is notable that Article XII departs from Rule 8(d)(2)'s more precise language and states simply that an employee "must" exercise his rights by the end of the forty-eight-hour period, without speaking to the effect of that exercise on his status vis-à-vis CSXT's availability policies. (R. 13-2, Page ID## 275–76.) It would seem that however Rule 8(d)(2) is interpreted—to have coexisted with CSXT's enforcement rights or to have precluded their exercise—it weakens any argument that the present CBA protects employees from discipline.

does not excuse voluntary unavailability for attendance purposes. If a displaced employee can immediately exercise seniority against a junior employee to avoid losing work time, the employee makes himself voluntarily unavailable for attendance purposes if he chooses to delay . . . ." (R. 13-2, Page ID# 274.) Other arbitrators had reached similar conclusions about the interaction of availability policies with displacement rights.[4] For example, one arbitrator had considered Article XII and concluded that "[w]hile the agreement does allow the claimant time to place himself, it does not allow the claimant to use it as a vehicle to avoid work." (R. 1-1, Page ID# 14 (citation omitted).) Evaluating SMART-TD's arguments in light of these decisions, the arbitrator clearly was interpreting the contract. We have instructed arbitrators to consider, as part of their decision-making, arbitral precedent construing the same agreement. *See Int'l Union v. Dana Corp.*, 278 F.3d 548, 557 (6th Cir. 2002). This the arbitrator has done.

SMART-TD and the dissent contend, however, that under the arbitrator's ruling, CSXT is allowed to discipline someone for exercising displacement rights within the forty-eight-hour window but not outside it and that this outcome is "nonsensical." Dissent at 16, 18; Appellant Br. at 9. Under the arbitrator's reasoning, they argue, Article XII provides that an employee who does not exercise his displacement rights until the forty-eight hours have passed will be assigned to an extra board but may not be disciplined under CSXT's availability policies. By contrast, again based on how SMART-TD and the dissent characterize the arbitrator's reasoning, an employee

---

[4] SMART-TD argued before the arbitrator that the previous arbitration decisions should not control in this case because none of them had "squarely addressed" the identical combination of parties or agreements at issue here. (R. 1-1, Page ID# 15.) The arbitrator considered this objection but found that the arbitrators' decisions in those cases had employed reasoning directly applicable to this case. In any event, the arbitrator merely considered those decisions and did not purport to find any of them controlling. Their existence does, however, support the reasonableness of the outcome the arbitrator reached in this case and dissolves any possibility that she simply applied her "own brand of industrial justice," as SMART-TD argues. Appellant Br. at 17 (quoting *Mich. Family*, 475 F.3d at 754 (internal quotation marks omitted)).

who exercises his rights after the time set by the availability policies, but before forty-eight hours have passed, may be disciplined despite the CBA.

We do not believe SMART-TD and the dissent accurately characterize the arbitrator's ruling. The arbitrator never claimed—nor do we—that the CBA "barr[ed] discipline against employees who violate the displacement rules but authoriz[ed] discipline against employees who comply." Dissent at 18. Indeed, because Article XII purports to address only the assignment-related consequences of delaying a decision beyond forty-eight hours, the CBA could be read not to preclude discipline for *anyone* who violates the availability policy, regardless of whether that employee exercises displacement rights within forty-eight hours.

But even if the CBA were construed to permit CSXT to discipline employees who act inside the forty-eight-hour window but not outside it, that outcome would be a consequence of the CBA itself, not of the arbitrator's own will. The arbitrator would simply be applying an arguably correct interpretation of the CBA. We disagree with SMART-TD's assertion that Article XII gives employees a forty-eight-hour grace period "in the clearest of all possible terms," Appellant Br. at 9–10, and the dissent's twin contention that Article XII "*necessarily* precludes" disciplining employees within that period, Dissent at 18 (emphasis added). Article XII could have been clearer if the intent was to insulate employees from discipline for forty-eight hours: it could have read, for example, "An employee who has a displacement right *will have* forty-eight hours in which to exercise that right." Other, even clearer, formulations could be imagined. Instead, the CBA fails explicitly to assure employees of forty-eight hours free of penalty: the text sets a maximum amount of time for the employees to exercise displacement rights, not a minimum amount of time the employer must wait before disciplining employees for unavailability.

Finally, SMART-TD repackages its argument that the arbitrator was not truly engaged in interpretation into an assertion that the arbitrator "exceed[ed] . . . her authority [under the Railway Labor Act] in attempting to alter or rewrite the parties' agreement." Appellant Br. at 19. But because, as we have discussed, the arbitrator examined the text of the CBA, the parties' negotiating history, and arbitral precedent before arriving at an interpretation clearly within the range of acceptable readings, any argument that she was attempting to "rewrite" the CBA must fail.

SMART-TD seeks support in *Wilson v. Chicago & North Western Transportation Co.*, 728 F.2d 963, 966–67 (7th Cir. 1984). There, the Seventh Circuit vacated, for failure to comply with the Railway Labor Act, an arbitration award upholding the dismissal of several employees in clear contravention of a CBA provision that read, "If investigation [of an employee] is not held or decision rendered within the time limits specified herein . . . the charges against the employe[e] *shall be* considered as having been dismissed." *Id.* at 965 (emphasis added) (internal quotation marks omitted). The plaintiff employees had been dismissed after the employer held a hearing outside the applicable time period, and the Seventh Circuit found that the arbitrator ignored the language of the CBA in upholding the employees' termination rather than treating the charges as having been dismissed once the deadline passed. *Id.* at 966–67.

*Wilson*'s facts are not on point. The CBA provision there required that charges be dismissed if the employer did not hold a hearing within the applicable time period. By contrast, here, there is no comparable direct command in the CBA that the arbitrator ignored. The arbitrator acted within her authority to interpret the CBA as setting an outside limit on the time when employees must exercise their displacement rights to avoid being assigned to an extra board, but not addressing at all the discipline that CSXT may impose if employees miss work in violation of CSXT's availability policies.

At the end of the day, SMART-TD's appeal stands or falls on the highly deferential standard of review to which our precedent entitles the arbitrator's decision. The worst that could be said of the arbitrator's decision in this case is that it read the CBA literally. Literalism is not a misstep worthy of vacatur. Because SMART-TD has not persuaded us that the arbitrator abandoned the project of interpretation to concoct an outcome not supported by the CBA, our extremely deferential standard of review has been satisfied here.

## V. CONCLUSION

Because the arbitrator was "arguably construing" the CBA when she found it did not proscribe CSXT's disciplinary actions against SMART-TD members, *Michigan Family*, 475 F.3d at 753, the district court was correct to uphold the arbitrator's award. We therefore **AFFIRM** the district court's grant of summary judgment to CSXT.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** The National Railroad Adjustment Board's decision has all the trappings of a legitimate arbitration decision. It refers to and quotes from the collective bargaining agreement; it analyzes the relevant provisions of the agreement; it draws from arbitration precedent. But in the end it reaches an outcome that is substantively untenable. Although review of a labor arbitrator's decision is extraordinarily deferential, cases are not resolved by the standard of review alone. "[W]e review outcomes, not opinions," when deciding whether to vacate an arbitration award. *Mich. Family Res., Inc. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746, 755 (6th Cir. 2007) (en banc). Because the outcome in this case conflicts with the plain language of the CBA, I must dissent.

The Board properly recognized that a carrier "may establish reasonable policies with respect to employee attendance, *so long as the policies do not conflict with the provisions of the [parties' collective bargaining] Agreement*." R. 1-1 (Habel Arbitration Award at 7) (Page ID #14). Looking at the plain language of the policy at issue here, it is clear that it conflicts with the CBA. Article XII of the 1996 UTU National Agreement expressly grants employees up to forty-eight hours to exercise their seniority rights, and Q&A 7—which was negotiated and drafted to "inform the application of Article XII," *see* R. 17 (Mem. in Support of CSXT's Mot. for Summ. J. at 4) (Page ID #662)—makes clear that "the intent of Article XII" is *not* "to impose discipline on employees who fail to exercise seniority within 48 hours." R. 13-2 (Habel Ex. S at 2) (Page ID #278). It defies reason to read these provisions—which indisputably authorize employees to take up to forty-eight hours to exercise their seniority rights and bar the carrier from disciplining

employees who do *not* exercise their seniority rights within that timeframe[1]—to allow the carrier to discipline employees who *do* exercise their seniority rights within the authorized period of time.

The majority justifies that very outcome here as within the arbitrator's discretion only by engaging in strained and nonsensical interpretations of Article XII and, especially, of the Q&As. It would have been *perhaps* within the arbitrator's discretion to find that Article XII, standing alone, governed only the rights of senior employees as to junior employees, rather than the rights of employees as to their employer (although Section 1(b) pushes that conclusion to the outer bounds of reasonableness). But Article XII does not stand alone. The Q&As foreclose any conclusion other than finding that the arbitrator's decision contradicts the CBA.

The majority characterizes Q&A 7 of the 1996 Q&As—"Is it the intent of Article XII to impose discipline on employees who fail to exercise seniority within 48 hours? No"—as merely "clarif[ying] that Article XII itself was not an instrument of discipline." Maj. Op. at 7. The plain language of Q&A 7, however, does more than clarify that Article XII itself is not a mechanism of discipline. It says that if an employee fails to exercise seniority within 48 hours, then that employee will not be disciplined and the consequences of such a failure would be governed instead by Section 1(b). The idea that this Q&A—an item drafted to help *clarify* contractual rights—means only that *Article XII* is not a disciplinary mechanism (but other provisions may be) defies reason and the lived experiences of any person who has ever referred to a Q&A section for

---

[1] This is an accurate characterization of the arbitrator's ruling, despite the majority's assertions to the contrary. Maj. Op. at 12. True, the arbitrator "never claimed . . . that the CBA 'barr[ed] discipline against employees who violate the displacement rules but authoriz[ed] discipline against employees who comply." *Id.* But that is exactly the effect that the arbitrator's opinion has. Under the plain language of Section 1(b) of the CBA, if an employee fails to exercise displacement rights within 48 hours, that employee will be assigned to an "extra board." As an "extra board [is] considered an assignment" under Rule 64(2)(a) of the 1994 B&O Agreement, R. 13-2 (CSXT Ex. T at 1) (Page ID #279), an employee who is assigned to "extra boards" cannot be "unavailable" under CSXT's attendance policy and therefore is not subject to discipline under that policy.

guidance. No one cares under which contractual provision he or she is disciplined; the important question is whether discipline will happen.

In addition, the majority interprets the 2010 Q&As as, at most, "suggest[ing] both parties understood CSXT's 2010 availability policies *not to interfere* with the employees' ability to take a full forty-eight hours to displace junior employees." Maj. Op. at 8 (emphasis added). But of course disciplinary consequences for taking a full forty-eight hours is an interference with an employee's ability to take that time. Even under the majority's reading of the Q&As the arbitrator's conclusion is untenable.

Finally, the majority points out that Section 1(b)—the portion of the CBA that Q&A 7 says governs the consequences for failure to exercise displacement rights within forty-eight hours— does not refer to discipline. That is true and is the point: an employee will not be disciplined at all for such a failure. Thus, it is untrue to say that the CBA "simply does not address its interaction with CSXT's availability policies at all." Maj. Op. at 9. By explicitly stating the consequences of a failure to exercise displacement rights in Section 1(b), and then by clarifying in Q&A 7 that Section 1(b) is not a disciplinary mechanism, the CBA addresses the consequences—disciplinary or otherwise—of exercising or failing to exercise displacement rights. The availability policy goes unmentioned *because* discipline for unavailability was not to be a consequence. But to the extent that the majority finds the arbitrator's outcome to be tenable by reading Article XII as silent on the issue of discipline, including discipline based on availability, that conclusion is mistaken.

The argument that the arbitrator's decision was reasonable because the CBA was silent on discipline—because Section 1 of Article XII does not expressly bar CSXT from disciplining its employees *within* the forty-eight-hour displacement window, such discipline comports with the parties' CBA—misapplies the principles from our cases. It is true, of course, that a contract can

17

be sufficiently silent on a topic to allow even poorly reasoned interpretations to survive our narrow scope of review. In *Michigan Family*, for instance, we considered whether a contract that expressly required government-funded cost-of-living increases to be distributed equally among union and non-union workers also required employer-funded cost-of-living increases to be distributed equally among both sets of workers. 475 F.3d at 754. There, we explained that the contract's silence as to "whether parity must exist between union and non-union cost-of-living increases funded by the employer" demonstrated that the contract was "ambiguous," and therefore the arbitrator was required "to engage in construction of the agreement." *Id.* at 754–55. We believed the arbitrator was likely wrong to conclude that the agreement required such parity, as, upon de novo review, we would have held that "the agreement's explicit parity requirements for government-funded, cost-of-living increases implied that the parties did not mean to create other parity requirements." *Id.* at 756. Nevertheless, we held that the arbitrator's legal error, even if serious, was still "an error of interpretation," and thus one we could not remedy on appeal. *Id.*

The parties' contract here, however, is not "silent" in the way the parties' contract was "silent" in *Michigan Family*. There, the agreement expressly required one benefit and said nothing about another. The arbitrator therefore had to "look[] for other indicators of meaning . . . to resolve this ambiguity." *Id.* at 755. Here, by contrast, the contract's express provision of forty-eight hours to exercise a negotiated right necessarily precludes the carrier from strong-arming employees into exercising their rights more quickly. It is nonsensical to read the contract as barring discipline against employees who violate the displacement rules but authorizing discipline against employees who comply. At bottom, a "contract is not [necessarily] ambiguous just because it is silent on a particular issue," *Werner v. Progressive Preferred Ins. Co.*, 310 F. App'x 766, 769 (6th Cir. 2009), and the parties' CBA offers a prime example of an unambiguous unwritten restraint.

CSXT resists this conclusion by arguing that Section 1 of Article XII precludes only discipline initiated because an employee failed to comply with the *displacement* policy, not discipline initiated because an employee failed to comply with the *attendance* policy. *See* Appellee Br. at 29. Though CSXT has identified semantic differences between the two scenarios, the distinction is meaningless in practice. The employees here were disciplined because they waited until the end of their authorized forty-eight-hour displacement period to exercise their seniority rights. CSXT's recasting of the purported reason for the discipline does not alter the conduct that triggered it. And CSXT's argument before the arbitrator that "[n]othing in the Agreements creating the 48-hour period for exercising seniority to another assignment also created the right to be unavailable for work during that period" does not make that statement fact. Maj. Op. at 7. Section 1(b) of the CBA, along with Q&A 7, created just such a right. The arbitrator was not entitled to ignore that plain language. It may be that the arbitrator appeared to be engaged in interpretation, but appearances can deceive. Maj. Op. at 8.

In sum, all the trappings of interpretation in the world cannot save an arbitration that ignores the plain language of a contract. *See Mich. Family*, 475 F.3d at 753 ("[W]e cannot ignore the specter that an arbitration decision could be so 'ignor[ant]' of the contract's 'plain language' as to make implausible any contention that the arbitrator was construing the contract." (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987))). Decorations and trimming cannot revive a construction that is rotten at its foundation. The majority's ultimately unavailing struggle to find an interpretation of the CBA that does not conflict with CSXT's exercise of its policies reveals the deficiencies of the arbitration decision itself. The parties agreed to give employees forty-eight hours to exercise displacement rights. CSXT now wishes that employees would act faster and is using its unilateral attendance policy to incentivize such speed.

Because the unambiguous terms of the parties' CBA bar CSXT from disciplining employees in this fashion, I respectfully dissent.